IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,                    3:11-CR-00247-BR

                    Plaintiff,               OPINION AND ORDER ON
v.                                            POST-TRIAL MOTIONS
                                             #401, #402, #403, and #404
MARK A. NEUMAN, TIMOTHY D.
LARKIN, LANE D. LYONS,

                    Defendants.


S. AMANDA MARSHALL
United States Attorney
District of Oregon
SETH D. URAM
DONNA M. MADDUX
Assistant United States Attorneys
1000 S.W. Third Ave., Suite 600
Portland, OR 97204-2902
(503) 727-1000

        Attorneys for Plaintiff

**JANET LEE HOFFMAN**
**CARRIE MENIKOFF**
Janet Hoffman & Associates LLC
1000 S.W. Broadway, Suite 1500
Portland, OR 97205
(503) 222-1125

**ROBERT R. CALO**
Lane Powell, PC
601 S.W. Second Avenue, Suite 2100
Portland, OR 97204
(503) 778-2104

       Attorneys for Defendant Larkin

**JOHN S. RANSOM**
Ransom Blackman, LLP
1001 S.W. Fifth Avenue, Suite 1400
Portland, OR 97204
(503) 228-0487

**MATTHEW A. SCHINDLER**
501 Fourth Street, #324
Lake Oswego, OR 97034
(503) 699-7333

       Attorneys for Defendant Lyons

**EMILY SIMON**
26 N.E. 11th Ave.
Portland, OR 97232
(503) 239-6101

**TODD H. GROVER**
Ward Grover, LLP
233 S.W. Wilson Avenue, Suite 204
Bend, OR 97701
(541) 312-5150

       Attorneys for Defendant Neuman

**BROWN, Judge.**

This matter comes before the Court on the Motion (#401) in Arrest of Judgment as to Count Two filed by Defendants Mark A. Neuman, Timothy D. Larkin, and Lane D. Lyons; Defendants' Motions (#402, #404) for New Trial; and Defendant Larkin's Motion (#403) for New Trial. The Court concludes the record is sufficiently developed, and, therefore, oral argument would not be helpful in resolving these Motions. For the reasons that follow, the Court **DENIES** the Motions.


## BACKGROUND

On June 22, 2011, Defendants were each charged with one count of Conspiracy to Commit Wire fraud in violation of 18 U.S.C. § 1349 and one count of Conspiracy to Commit Money Laundering in violation of 18 U.S.C. § 1956(h).

On July 3, 2013, at the conclusion of a 17-day trial, the jury found Defendants guilty of all conspiracy counts.

On July 17, 2013, Defendants filed their Motion (#401) to Arrest the Judgment as to Count Two and two Motions (#402, #404) for New Trial. Defendant Larkin also filed a separate Motion (#403) for New Trial asserting separate grounds from his co-Defendants. As noted, the Court concludes oral argument would not be helpful.

<u>**STANDARDS**</u>

### I.    <u>Motion in Arrest of Judgment</u>

Federal Rule of Criminal Procedure 34 provides:  "Upon the defendant's motion or on its own, the court must arrest judgment if:  (1) the indictment or information does not charge an offense; or (2) the court does not have jurisdiction of the charged offense."  Fed. R. Crim. P. 34(a).  Pursuant to Rule 34(b) a defendant must move for arrest of judgment within fourteen days from the time the court accepts a guilty verdict.

A court must decide a Rule 34 motion based on the indictment, the plea and the verdict rather than on the evidence. *United States v. Sisson*, 399 U.S. 267, 281 (1970)("a judgment can be arrested only on the basis of error appearing on the 'face of the record,' and not on the basis of proof offered at trial"). *See also United States v. Guthrie*, 814 F. Supp. 942, 944 (E.D. Wash. 1993)("A Rule 34 motion for arrest of judgment . . . must be decided on the record alone, that is, on the indictment, plea, and verdict.")(citations omitted).

### II.  <u>Motion for New Trial</u>

Federal Rule of Criminal Procedure 33(a) provides in pertinent part:  "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  The defendant carries the burden to

justify the need for a new trial.  The determination whether the defendant has satisfied that burden rests in the discretion of the court.  *United States v. Mack*, 362 F.3d 597, 600 (9th Cir. 2004).  If the court concludes the evidence is sufficient to sustain the verdict but a serious miscarriage of justice may have occurred, the court may grant the motion for a new trial.  *United States v. Kellington*, 217 F.3d 1084, 1097 (9th Cir. 2000).

## DISCUSSION

## I.  Defendants' Motion (#401) in Arrest of Judgment

On June 24, 2013, Defendant Neuman filed a Motion (#372) for Judgment of Acquittal joined by Defendants Larkin and Lyons in which they contended that conspiracy to commit money laundering is not an offense chargeable under 18 U.S.C. § 1956(h). Consistent with the arguments made in that Motion, Defendants now move for Arrest of Judgment pursuant to Rule 34 on the ground that conspiracy to commit money laundering is not "specified unlawful activity" under 18 U.S.C. § 1956(c)(7), and, therefore Count 2 fails to charge an offense.  In Motion #372 Defendants argued because conspiracy to commit wire fraud is not "specified unlawful activity" as defined under 18 U.S.C. §§ 1956 and 1961, the government did not allege a chargeable offense in Count 2,

and, therefore, they were entitled to a judgment of acquittal on Count 2.

The Court heard oral argument on the legal question presented in Motion #372 on June 24, 2013. On June 26, 2013, the Court issued an Order (#374) denying Motion #372.

Although Defendants acknowledge in their current Motion that they are asserting grounds identical to those previously raised in Motion #372, Defendants assert they have identified additional case law to support their position. The Court has considered Defendants' arguments again, reviewed the additional case law, and concludes Defendants have not established that an error was made.

Defendants do not cite any controlling authority for their proposition that conspiracy to commit mail or wire fraud cannot constitute "specified unlawful activity" under §§ 1956 or 1961 or that Count 2 fails to contain a chargeable offense. Moreover, Defendants ignore case law upholding convictions for conspiracy to commit wire fraud and conspiracy to commit money laundering. *See, e.g., United States v. Kimbrew*, 406 F.3d 1149, 1152 (9th Cir. 2005)(affirming conviction for conspiracy to commit money laundering). *See also United States v. Hasson*, 333 F.3d 1264, 1275 (11th Cir. 2003)(affirming convictions for conspiracy to commit wire fraud and conspiracy to commit money laundering);

*United States v. Abdulwahab*, 715 F.3d 521, 532-33 (4th Cir. 2013)(reversing money laundering conviction but upholding convictions for conspiracy to commit money laundering and conspiracy to commit wire fraud).

In addition, Defendants overlook the fact that the government is not required to prove a predicate act under § 1956(h). *See United States v. Martinelli*, 454 F.3d 1300, 1312 (11th Cir. 2006)("It is by now abundantly clear that in a money laundering case (or in a money laundering conspiracy case), the defendant need not actually commit the alleged specified unlawful activity.").

Finally, the new cases upon which Defendants rely are readily distinguishable. Defendants cite cases that focus on interpretations specific to the RICO statute (18 U.S.C. § 1962(c, d)) that have been overruled or that contemplate theories that have been rejected by the Ninth Circuit. *See, e.g., United States v. Weisman*, 624 F.2d 1118, 1123-24 (2d Cir. 1980)(noting some subsections of § 1961 may serve as predicate acts of racketeering activity); *United States v. Ruggiero*, 726 F.2d 913, 919-20 (2d Cir. 1984), *overruled by Salinas v. United States*, 522 U.S. 52, 63 (1997)(citing 18 U.S.C. § 1962(d) and noting that conspiracies to violate substantive RICO provisions may be predicate acts). *Compare R.E. Davis Chem. Corp. v. Nalco*

*Chem. Co.*, 757 F. Supp. 1499, 1510 (N.D. Ill. 1990)(recognizing conspiracy to commit wire fraud could not be a predicate act of racketeering activity under 18 U.S.C. § 1962(d)), and *Allington v. Carpenter*, 619 F. Supp. 474, 479 (C.D. Cal. 1985)(same), *with United Energy Owners Comm., Inc. v. U.S. Energy Mgmt. Sys.*, 837 F.2d 356, 360 (9th Cir. 1988)(rejecting *Allington's* multiple criminal episode theory of pleading a pattern of racketeering activity under RICO).

In short, the Court has considered Defendants' arguments again and concludes they do not provide a basis to alter the Court's previous ruling or to grant the Motion in Arrest of Judgment. Thus, the Court denies Defendants' Motion (#401) in Arrest of Judgment as to Count Two.

## II. **Defendants' Motion (#402) for New Trial**

Defendants move for a new trial on the grounds that (1) the Court erred by failing to instruct the jury as requested concerning Defendants' character and by improperly restricting Defendants' presentation of character evidence under Federal Rule of Evidence 404; (2) the Court erred by refusing to merge Count 2 with Count 1 pursuant to *United States v. Santos* and *United States v. Van Alstyne* and erroneously instructed the jury that "proceeds" were "gross receipts"; (3) the government failed to prove two separate conspiracies necessary to support convictions

on Counts One and Two; (4) there was insufficient evidence to support the Court's instruction on deliberate ignorance; (5) the Court erroneously instructed the jury regarding the term "trust"; (6) the government's theory of fraud was legally flawed because Defendants did not have a duty to disclose; and (7) the Court erroneously admitted into evidence emails as business records under Federal Rule of Evidence 803(6).

## A.    Character Evidence

Defendants contend the Court erred by refusing to provide an instruction about Defendants' character evidence.  In addition, Defendants argue the Court's evidentiary rulings during trial impermissibly limited the scope of their questions directed to their character witnesses.  The Court disagrees.

A single jury instruction may not be judged in isolation, but must be viewed in the context of the overall charge.  *United States v. Powell*, 955 F.2d 1206, 1210 (9th Cir. 1991).  *See also United States v. Harrison*, 34 F.3d 886, 889 (9th Cir. 1994).  The court has wide latitude in tailoring jury instructions as long as the instructions taken as a whole fairly and adequately guide the jury's deliberations and cover the issues presented.  *United States v. Peppers*, 697 F.3d 1217, 1120 (9th Cir. 2012)(*per curiam*), *cert. denied*, 133 S. Ct. 1477 (2013).  *See also United States v. Moore*, 109 F.3d 1456, 1465 (9th Cir. 1997)(*en banc*).  A

district court's formulation of jury instructions is reviewed for abuse of discretion. *Powell*, 955 F.2d at 1210. "'Jury instructions, even if imperfect, are not a basis for overturning a conviction absent a showing that they prejudiced the defendant.'" *United States v. Cherer*, 513 F.3d 1150, 1155 (9th Cir. 2008)(quoting *United States v. Frega*, 179 F.3d 793, 807 n.16 (9th Cir. 1999)).

Defendants contend evidence of their good character, standing alone, may create reasonable doubt and cite *Michelson v. United States*, 335 U.S. 469, 476 (1948), and *Edgington v. United States*, 164 U.S. 361, 366 (1896), to support their position. The Ninth Circuit, however, has distinguished *Michaelson* and *Edginton* and determined an instruction specific to a defendant's character does not "require any more than that the jury be freely permitted to consider character evidence along with all other evidence upon the issue of guilt." *Carbo v. United States*, 314 F.2d 718, 746 (9th Cir. 1963). Thus, this Court did not abuse its discretion when it refused to provide Defendants' requested instruction. *See United States v. Karterman*, 60 F.3d 576, 579 (9th Cir. 1995) (refusal to give instruction on character evidence was not plain error). *See also* Ninth Cir. Model Crim. Jury Instruction 4.4 ("The Committee believes that the trial judge need not give an instruction on the character of the defendant when such evidence

is admitted under Fed. R. Evid. 404(a)(1) because it adds nothing
to the general instructions regarding the consideration and
weighing of evidence.").

Consistent with Model Instruction 4.4, the Court did not
give an instruction particular to the character of Defendants.
Instead the Court instructed the jury to evaluate the statements
of all witnesses and to take into account any factors that bear
on the believability of any witness. *See* Ninth Cir. Model Crim.
Jury Instruction 3.9 (listing factors for jury to consider when
evaluating credibility of witnesses).  The Court also instructed
the jury to weigh all of the evidence, and if they were not
convinced beyond a reasonable doubt after considering all of the
evidence that the government "proved a particular Defendant
guilty of a particular charge, it is your duty to find that
Defendant not guilty of that charge."  Final Jury Instructions
(#383) at 4-5.  Thus, the instructions, when viewed as a whole,
adequately guided the jury's deliberations and were an accurate
statement of the law.

Defendants also cite *United States v. Maloney* in which the
Ninth Circuit determined the trial court did not err when
instructing the jury that "all the evidence" included evidence of
defendant's character for truthfulness, honesty, and "law
abidingness."  699 F.3d 1130, 1139 (9th Cir. 2012), *rehearing en*

*banc granted*, 717 F.3d 1042 (9th Cir. 2013).  In *Maloney* the

defendant argued on appeal that the jury instruction did not

adequately present the nexus between a defendant's good character

and reasonable doubt.  The Ninth Circuit determined the

instructions, when examined as a whole, did not mislead the jury

or inaccurately state the law.  *Id.*  The Ninth Circuit, however,

has granted *en banc* review of *Maloney*, and Defendants concede in

their reply that *Maloney* is not controlling.

        In addition, the Court finds Defendants' argument that the

Court erroneously restricted Defendants' presentation of

character evidence is completely lacking in foundation.  At trial

Defendants presented numerous character witnesses who testified

Defendants were truthful and honest.  Moreover, as the Court

noted during trial, the Court would have quickly sustained a

government objection to the cumulative nature of Defendants'

character evidence if such an objection had been made because of

the sheer volume of good character evidence Defendants did submit

without objection.  Thus, after reviewing the record, the Court

concludes the generous admission of Defendants' character

evidence was more than consistent with Rule 404.

        Finally, even if there was an error in the jury instructions

concerning Defendants' character evidence, Defendants have not

established the error was harmful.  *See Cherer,* 513 F.3d at 1155.

Defendants have not explained how a different instruction concerning Defendants' character would have altered the outcome of the trial. For example, the government introduced the hotly contested October 2006 Confidential Memo authored by Defendant Lyons (Lyons Confidential Memo or Memo) and given to Defendants Larkin and Neuman and others in which Lyons discusses the Defendants' practice of advancing exchange clients' (Exchangers) funds to Inland Capital, after which Inland would re-loan those funds to other companies owned by Defendants. Trial Ex. 67. In the Memo Lyons states the practice is a misrepresentation to the Exchangers in part because the Inland loans were not up to industry standards and the Exchangers' funds were not "well secured" as represented. Trial Ex. 67.

At trial the government also introduced an email dated June 20, 2007, authored by Defendant Lyons and sent to Defendant Larkin with a subject line of "website security." Trial Ex. 187. In the email Lyons expresses his concern about the "Security of Exchange Funds" page posted on Summit's website: "First, we mention that our funds are invested exclusively in bank accounts and in US Treasury Backed Securities. That's false, and if anything happened a materially and knowingly false claim like that would be fodder for a fraud claim." The evidence showed Larkin then forwarded the June 2007 email to Summit's marketing

director, Gregory Fowler, and noted edits to the website were
necessary to address Lyons's concerns, but neither Larkin nor
Lyons followed up with Fowler to ensure changes were made at that
time.  *Id.*

The government presented evidence establishing that
Defendant Neuman was responsible for the "Security of Funds"
language in a 1999 brochure and approved the use of that language
for the website in 2000.  The evidence further demonstrated the
"Security of Funds" language remained on the website until
December 2008 when Lyons insisted the statement be removed, which
was just days before Summit closed its doors in 2008.  Trial Exs.
185, 198.  Moreover, co-conspirator Brian Stevens testified he
and Defendant Neuman did not disclose to Exchangers the nature of
the investments made with Inland because he knew if they did, the
Exchangers would demand segregated accounts.

This cited evidence shows only some of the overwhelming
evidence of Defendants' guilt.  In light of the totality of the
evidence presented at trial, the Court concludes there is not any
amount of good-character evidence that would have persuaded the
jury to reach a different outcome even if the jury had been
instructed as Defendants contend.  In short, Defendants have not
demonstrated that the Court abused its discretion when tailoring
the jury instructions or admitting Defendants' character evidence

or that a new trial is warranted to correct a manifest injustice on this character evidence issue.

### B. *Santos* and *Van Alstyne*

Defendants argue the conspiracy to commit money laundering charges in Count 2 should be dismissed or should merge with the conspiracy to commit wire fraud charges in Count 1 because the money loaned from Summit to Inland does not constitute "proceeds" of criminal activity under 18 U.S.C. §§ 1956(h) and 1957 or under interpretations of those statutes in *Santos v. United States*, 553 U.S. 507 (2008), and *United States v. Van Alstyne*, 584 F.3d 803 (9th Cir. 2009). Defendants also contend the jury was improperly instructed that "proceeds" means "gross receipts" instead of "profits" as they read *Santos* and *Van Alstyne*. Defendants have raised this issue previously (#38, #310, #361), and, as the record reflects, the Court consistently has rejected their arguments (#61, #351, #383) in the context of the evidence in this case.

The Court notes the Ninth Circuit issued a decision in *United States v. Grasso*, 724 F.3d 1077 (9th Cir.), *cert. denied,* Case No. 13-6325, 2013 WL 4986979 (U.S. Oct. 21, 2013), after Defendants filed Motion #402. In *Grasso* the Ninth Circuit again discussed the *Santos* merger issue in the context of a fraud case. According to the government, the *Grasso* decision is consistent

with the Court's previous rulings, but Defendants seek to distinguish *Grasso* in their Reply and contend their interpretations of *Santos* and *Van Alstyne* control. The Court has considered Defendants' arguments anew in light of *Grasso* and concludes *Grasso* does not aid Defendants nor does it constitute a basis for a new trial.

In *Grasso* the defendant Kyle Grasso was convicted of bank fraud, loan fraud, money laundering, and conspiracy to commit bank and loan fraud arising out of a complicated mortgage-lending scheme. *Grasso*, 724 F.3d at 1081. Mark Abrams, a mortgage broker, conspired with Charles Fitzgerald, a real estate developer, to purchase real estate, to obtain loans for amounts significantly above the actual sales price, and to pocket the difference between the sales price and the loan amount. Grasso was a real estate agent who assisted Abrams and Fitzgerald with the scheme. *Id.* Grasso became affiliated with Prudential Realty and obtained an interest in Cal Title, a title-insurance company through which the fraudulent scheme operated. *Id.* Eventually Grasso also earned a "referral fee" on transactions with Cal Title even when Grasso was not the agent involved in the purchase or sale. *Id.* at 1085.

After a jury trial Grasso was convicted on all counts, including money laundering for receipt of "referral fees" on two

real estate transactions.  On appeal Grasso argued his money
laundering offense in violation of 18 U.S.C. § 1956 merged into
the underlying loan and bank fraud charges pursuant to *Santos*,
and, therefore, the money laundering offense could not be
separately punished.  *Id.* at 1090.

The *Grasso* court examined *Santos* and its progeny and
concluded the Ninth Circuit "ha[s] derived the controlling rule
that 'proceeds' means 'profits' where viewing 'proceeds' as
'receipts' would present a 'merger' problem of the kind that
troubled the plurality and concurrence in *Santos*."  *Id.* at 1092
(quoting *Van Alstyne*, 584 F.3d at 814).  The Ninth Circuit set
out three factors for the court to consider when determining
whether a "merger problem" exists:  (1) whether a given
transaction is a "central component" of the underlying scheme,
(2) whether inclusion of the money laundering charge leads to a
radical increase in the statutory maximum sentence for the
underlying charge, and (3) whether the money used in co-
conspirator transfers involves contraband or bribery.  *Id.* at
1092-93.

After applying these factors, the *Grasso* court concluded:
(1) "referral fees" paid to Grasso were not central to the fraud
scheme because they actually hindered the scheme by draining
funds that would otherwise be reinvested in the fraud; (2) the

ten-year difference in the statutory maximum sentences between the bank fraud count and the money laundering count did not represent a radical increase in the punishment intended by Congress for the underlying charge; and (3) "proceeds" does not mean profits "when a money laundering conviction is based on kickbacks and transfers to co-conspirators in schemes to defraud such as Abrams's." *Id.* at 1094-95.

Here Defendants contend the use of the Exchangers' funds was *the* central component of the wire fraud scheme; that this case is similar to the gambling scheme in *Santos* and the Ponzi scheme in *Van Alstyne*; and thus, the Exchangers' funds were not "gross receipts." Defendants, therefore, assert *Grasso* is distinguishable. The Court disagrees.

The "central component" of the wire fraud conspiracy scheme as alleged in Count 1 of the Indictment are the affirmative misrepresentations made to and the material omissions concealed from Summit's clients and potential clients to induce them to use Summit to complete their 1031 exchanges. Indictment (#1) ¶¶ 15, 16. In Count 2 the heart of the money laundering conspiracy charges were the individual transactions from Inland to limited liability companies in which Defendants had a personal stake in order to invest in real estate or to make loans "directly to individuals, businesses, and themselves." For example, Count 2

included the purchase of a real estate lot on which Defendant Neuman built a new residence; a check for $15,000 payable to Defendant Larkin; the purchase of real estate for relatives of Defendant Larkin; and money loaned to Riley Coyote, LLC, a company partially owned by Defendant Lyons. Moreover, evidence at trial established the Inland loan balance as of January 1, 2007, was 26 percent of all Summit investments. Thus, as in *Grasso*, the charges alleged in Count Two are not central to the fraud scheme as alleged in Count One. Also as in *Grasso*, the statutory maximum sentences for conspiracy to commit money laundering and conspiracy to commit wire fraud are not radically different. Thus, a "merger problem" does not exist.

In summary, the Court concludes *Grasso* does not provide a basis to alter the Court's previous rulings or to grant a new trial in this matter, and the Court again finds there is not any "merger problem" that would have precluded the Court from instructing the jury that "proceeds" means "gross receipts."

## C. Two Separate Conspiracies

Defendants also contend the single conspiracy proven by the government was that Defendants obtained *and* used the Exchangers' funds. Defendants appear to be arguing that the two conspiracy counts are multiplicitous. The Court disagrees.

The claim that an indictment has resulted in multiplicitous convictions is reviewed *de novo*. *United States v. Mancuso*, 718 F.3d 780, 790 (9th Cir. 2013). "An indictment is multiplicitous when it charges multiple counts for a single offense, thereby resulting in two penalties for one crime and raising double jeopardy concerns." *Id.* at 791. *See also United States v. Stewart*, 420 F.3d 1007, 1012 (9th Cir. 2005). Two counts in an indictment are not multiplicitous, however, if each separately-violated statutory provision requires proof of an additional fact that the other provision does not require. *Stewart*, 420 F.3d at 1012.

The Court finds Defendants' reliance on *United States v. Smith*, 424 F.3d 992, 1002 (9th Cir. 2005), is misplaced. In *Smith* the defendants were charged with three conspiracy counts for violating the same statute (18 U.S.C. § 371). On appeal the defendants argued the counts were multiplicitous and their sentences violated double jeopardy. The Ninth Circuit examined whether the multiple conspiracies charged were based on a single agreement or more than one agreement. *Id.* at 1001. The court ultimately concluded the jury determined that the defendants engaged in three separate conspiracies, and, therefore, the charges were not multiplicitous. *Id.* at 1003.

Here Defendants were charged with two conspiracies under two separate statutes, and, therefore, this case is more akin to *United States v. Kimbrew*.  In *Kimbrew* the defendants were charged in Count One with conspiracy to commit mail and wire fraud under 18 U.S.C. §§ 1341 and 1343, and in Count Two with conspiracy to launder money under 18 U.S.C. § 1956(h).  406 F.3d at 1152.  The *Kimbrew* court rejected the defendants' double jeopardy arguments: "Although both conspiracies concerned the same underlying fraud, the conspiracies were legally distinct and each required proof of something the other did not."  *Id.* at 1152.

As in *Kimbrew,* in order to convict Defendants of conspiracy to commit wire fraud, the jury had to find the use of wire communications to obtain the Exchangers' funds was part of Defendants' fraudulent scheme.  To convict Defendants of conspiracy to commit money laundering, however, the jury had to find a separate fact:  an agreement to use the "proceeds" of the Count One scheme to commit wire fraud.  The Court, therefore, finds Defendants have not established Count One and Count Two involved the same conspiracy and were multiplicitous.

Finally, to the extent that Defendants argue there was insufficient evidence to support their convictions on two separate conspiracy theories, the Court disagrees.  As noted, the government presented abundant evidence from which the jury could

find that Defendants agreed to use the wires to obtain the
Exchangers' funds through a fraudulent scheme and a separate
agreement to use the proceeds of that scheme for their own
benefit. The Court, therefore, concludes Defendants have failed
to demonstrate that a new trial is necessary to correct a
manifest injustice.

### D. Jury Instruction on Deliberate Ignorance

Defendants argue there was insufficient evidence presented
at trial to warrant the Court's instruction on deliberate
ignorance. Defendants also argue the deliberate ignorance
instruction was legally insufficient because the instruction
permitted the jury to conclude wrongly that Defendant Lyons
joined a conspiracy about which he was unaware.

As noted, the jury had in evidence the June 2007 email in
which Defendant Lyons informs Defendant Larkin that the Security
of Funds information on the website was false and the jury also
had in evidence the fact that neither of them took action to
correct that information. The evidence also proved the Security
of Funds statement remained on the website until December 2008
when Summit ceased operations.

In addition, outside counsel Kevin Keillor testified he was
never informed by Defendants that they were using Exchangers'
funds to make personal-type investments through Inland. Co-

conspirator Brian Stevens testified he and Defendant Neuman did not disclose the nature of the investments they made with Exchangers' funds because he knew the Exchangers would have demanded segregated accounts if they had done so. The evidence further showed the other Defendants did not seek a second legal opinion about the truth or falsity of the representations after receiving Defendant Lyons's June 2007 email because they knew a second opinion would confirm Lyons's opinion.

This and other direct and circumstantial evidence provided the government with the factual foundation to argue to the jury that it should infer Defendants deliberately avoided seeking legal advice about whether they were required to disclose to clients and potential clients the personal nature of the investments that Inland was making with Exchangers' funds. *See United States v. Ramos-Atondo*, Case Nos. 12-50208, 12-50211, 12-50214, 2013 WL 5583838, at *4 (9th Cir. Oct. 11, 2013) (deliberate ignorance instruction was properly given when evidence existed from which jury could infer the defendants' lack of knowledge resulted from the failure to investigate).

On this trial record the Court concluded the jury could find deliberate ignorance even if the jury rejected the government's evidence of actual knowledge. Accordingly, the Court gave the

following instruction as part of the instruction defining

"knowingly":

> You may find a Defendant "knew" certain
> information was false if you find beyond a
> reasonable doubt that the information was, in
> fact, false and (a) the Defendant understood
> this; or (b) the Defendant was aware of a
> high probability that the information was
> false but nevertheless deliberately avoided
> learning that the information was false.

> However, you may not find a Defendant
> knew certain information was false if you
> find the Defendant actually believed the
> information was true or if you find the
> Defendant was simply careless about learning
> whether the information was true or not.

Jury Instructions (#383) at 23.

The Court's instruction was based on Ninth Circuit Model

Criminal Jury Instruction 5.7 as tailored to fit the facts of

this case. *See United States v. Heredia* 483 F.3d 913, 924 (9th

Cir. 2007)(deliberate ignorance instruction must contain the two

prongs of "suspicion and deliberate avoidance").  Contrary to

Defendants' suggestion, the deliberate ignorance instruction did

not confuse the issues with respect to Defendant Lyons.  When the

instructions are read as a whole, the instructions accurately

informed the jury of the elements of conspiracy and accurately

instructed the jury as to the government's two competing theories

of knowledge:  actual knowledge and deliberate ignorance.  *See*

*Peppers*, 697 F.3d at 1120-21 (jury instructions taken as a whole

must fairly and adequately cover the theories presented).  It was
the responsibility of Defendants' counsel in their arguments to
distinguish the roles of each Defendant and to argue to the jury
the facts that allegedly created reasonable doubt.

Moreover, as noted, there was overwhelming evidence from
which the jury could conclude that Defendant Lyons had actual
knowledge that a conspiracy existed and that Lyons joined that
conspiracy with actual knowledge of its fraudulent purpose.
Based on this abundant evidence, Defendants have not established
any alleged error in the Court's deliberate ignorance instruction
had any impact on the jury's verdict.  *See Cherer*, 513 F.3d at
1155 (erroneous jury instruction is harmless if it is clear
beyond a reasonable doubt that a rational jury would have found
defendant guilty).  Thus, Defendants have not shown a new trial
is warranted on the basis of the deliberate ignorance
instruction.

**E.    Jury Instruction on "Trust"**

Defendants argue the Court improperly instructed the jury as
to the meaning of the term "trust," and, therefore, a new trial
is warranted.  According to Defendants, the Court's instruction
permitted the jury to infer an improper legal meaning of the term
"trust."

The term "trust" appeared in Summit's standard wire instruction documents. Prior to trial the parties disputed how the government should be permitted to use the term "trust" to avoid the improper suggestion that Defendants had a heightened or fiduciary duty of care as to Exchangers' funds. The government pointed out that the term was, in fact, used by Summit's representatives and by Defendants themselves when referring to how Exchangers' funds would be maintained. Defendants countered the government's use of the term "trust" should be limited because no fiduciary relationship existed between Defendants and the Exchangers, and, therefore, Defendants did not have a duty to disclose to the Exchangers how Summit was investing the funds. Motion in Limine (#191) at 11. Defendants also proposed calling an expert witness to testify about trusts and fiduciary relationships. Rule 16 Disclosure (#278) for Expert Witness Jonathan Levy.

In a pretrial Order (#249), the Court ruled as follows:

> With respect to Part E (Duty to Disclose), government counsel agreed at the March 8, 2013, hearing not to refer in the jury's presence to the relationship between Defendants and the Exchangers as a "fiduciary relationship" or to suggest the relationship created a heightened duty of disclosure beyond Defendants' duty not to misrepresent or to conceal material facts in violation of the wire- fraud statute, 18 U.S.C. § 1349. To the extent that Summit documents, Summit's

> representatives, or Defendants personally
> used the word "trust" in connection with
> describing to Exchangers how their funds
> would be maintained, the government is free
> to use that word in its trial presentations
> subject to any objection at trial that the
> government's references become misleading or
> prejudicially cumulative.

Order (#249) at 3-4.

On the morning of day four of the trial (June 13, 2013),

Defendants and the government submitted to the Court their

proposed instructions on the term "trust." Based on those

submissions, the Court drafted an instruction for the parties'

consideration:

> THE COURT: . . . . So, Counsel, you have
> what I worked out based on what you've given
> me. And what I need is some feedback about
> what might be missing or what's here that
> shouldn't be said, or better ways to say it,
> but we need to get to that quickly.
>
> Mr. Ransom?
>
> MR. RANSOM: Your Honor, the only objection --
> or the only request we would have would be
> that you remove the last lines starting after
> "heard them," and directing them to look at
> it as an issue of whether or not it's a false
> representation.
>
> That should come in your final –
>
> THE COURT: Well, actually that's that -- I
> don't mind deleting that for now. That's an
> argumentative point that you'll all be able
> to make.

So what you're suggesting is that I end the last sentence with, When you deliberate at the end of the case, you need to decide what the terms meant to those who used them and to those who saw, read, or heard them.

MR. RANSOM: Correct, your Honor.

THE COURT: So with that, you would be satisfied? Mr. Ransom?

MR. RANSOM: Yes.

Trial Transcript (#392), Excerpt of Witness Stevens (June 13, 2013) at 7-8.

Before the start of witness testimony that day, the Court gave the agreed-upon instruction to the jury:

You've been hearing and seeing references to terms like "held in trust," and "trust account." You're going to continue to hear and see those references. For purposes of this case, there is not any single legal definition that applies to those terms for this case.

At the end of the case, when you deliberate, you're going to need to decide what those terms meant to the people who used them and to those who saw, heard, or read them.

Trial Transcript (June 13, 2013) at 13.

Despite the fact that they agreed to the instruction at that time, Defendants now complain the instruction did not adequately inform the jury about the legal meaning of the word "trust" and contend the government repeatedly used the term and asked

witnesses what the term meant.  Defendants rely on *United States v. Weizenhoff*, 35 F.3d 1275 (9th Cir. 1994), to support their position that they are entitled to a new trial.

In *Weitzenhoff* managers of a waste-water treatment plant that operated under a federal permit were charged with felonies under the Clean Water Act after discharging untreated waste directly into the ocean.  Although it was undisputed that the discharges occurred, the defendants argued the discharges were authorized as "bypasses" under their permit.  *Id.* at 1286.  The central issue, therefore, was the legal interpretation of the permit.  In that case the trial court did not construe the permit, but instead left interpretation of the permit to the jury with the aid of expert testimony.  *Id.* at 1287.  On appeal the *Weitzenhoff* court determined construction of the terms of the permit was a question of law and that the trial court erred in leaving that question for the jury.  *Id.* at 1288.

Here Defendants argue the Court, like the *Weitzenhoff* court, erred by failing to define the term "trust" and improperly delegated that task to the jury.  The Court disagrees.

Unlike in *Weitzenhoff*, the guilt or innocence of Defendants in this case did not turn on the legal interpretation of "trust." Instead the issue is whether Defendants' use of that term was a material misrepresentation, which is a question of fact that is

proper for the jury to determine.  Thus, as Defendants agreed

during trial, the "trust" instruction would correctly guide the

jury's deliberations and was an accurate statement of the law.

Nothing has changed since trial to alter that conclusion.

Nevertheless, Defendants now complain that they were

"sandbagged" because they agreed not to call an expert to testify

about the term "trust" based on pretrial representations by the

government that it would limit its use of the term. Relying on

*United States v. Carpenter*, 808 F. Supp. 2d 366, 382 (D. Mass.

2011), a case also involving a 1031 qualified intermediary,

Defendants contend a new trial is warranted because the

government was repeatedly allowed to refer to a "trust"

relationship where none existed.  Defendant's reliance on

*Carpenter* is misplaced.  In *Carpenter* the court granted a motion

for new trial on the basis that the prosecutor "poisoned the

well" by repeatedly making statements concerning the "safety and

security" of the funds that were placed in escrow and held by the

qualified intermediary even though the exchange documents did not

specifically provide for "safety and security."  *Id.* at 381.  The

relevant documents provided the exchangers' funds would receive a

three-percent return or a six-percent return and defined the term

"escrow."  *Id.* at 382.

Here, however, unlike in *Carpenter*, the evidence showed
Defendants made affirmative statements about the safety and
security of Exchangers' funds and repeatedly used the term
"trust" in marketing materials.  For example, an April 2007
newsletter authored by Defendant Larkin and edited by Defendant
Lyons was distributed to Summit's Exchange Managers and Branch
Owners, was posted on Summit's website, and stated "exchangers
funds are held by the QI *in trust* for the exchanger during the
exchange period."  Trial Ex. 141 (emphasis added). Branch Owners
and Exchange Managers testified they received this article and
relied on the statements therein when advising Exchangers and
potential Exchangers.  Summit's Exchange Managers and Branch
Owners also testified they believed Exchangers' funds were held
in a trust-type account based on representations in the exchange
documents and wire transfer letter, and they communicated that
fact to Exchangers and prospective Exchangers.  In addition,
Exchange client Robert Lewis testified he relied on the wire
transfer letter and the Security of Funds statement on the
website when making his decision to use Summit for his 1031
exchange.  The Court permitted the government to ask Summit's
Exchange Managers, Branch Owners, and Exchangers about the impact
that the term "trust" had on them for the relevant purpose of
assisting the jury in resolving critical questions of fact,

31 - OPINION AND ORDER ON POST-TRIAL MOTIONS

including whether certain representations were made, whether those representations were false and material, and whether Defendants intended Exchangers to rely upon those representations.

Moreover, Defendants do not identify any objection they raised regarding the government's evidence or argument at trial nor do they contend the Court improperly responded to such an objection following the Court's instruction on the term "trust" which, as noted, Defendants helped to fashion and agreed to before it was given. Thus, Defendants' belated complaint is not well-taken. The Court finds the government's use of the term "trust" did not exceed the agreed-upon instruction and was not prejudicial. Accordingly, the Court concludes Defendants have not demonstrated a new trial is warranted to correct a manifest injustice on the basis of the "trust" jury instruction.

**F. Government's Theory of Fraud/No Duty to Disclose**

Defendants argue the government's concealment theory of fraud is legally flawed because the government did not establish Defendants had a fiduciary duty or a statutory duty requiring them to disclose the nature of their investments to Exchangers or prospective Exchangers. Defendants argue a new trial is warranted because the jury was invited to infer that Defendants committed fraud by failing to disclose information that they did

not have an obligation to disclose.  As detailed above, the Court previously considered and rejected Defendants' argument.  Order (#249) at 3-4.  The Court has considered Defendants' argument again and is not persuaded an error was made.

Defendants correctly note the Ninth Circuit has observed that "a non-disclosure can only serve as a basis for a fraudulent scheme when there exists an independent duty that has been breached by the person so charged." *United States v. Dowling*, 739 F.2d 1445, 1449 (9th Cir. 1984), *rev'd on other grounds*, 473 U.S. 207 (1985).  Here the government, however, relied on Defendants' affirmative misrepresentations in addition to alleged omissions.

Sufficient evidence of affirmative misrepresentations can establish a scheme to defraud under the wire fraud statute even in the absence of a duty to disclose.  *See, e.g., United States v. Benny*, 786 F.2d 1410, 1418 (9th Cir. 1986)("Proof of an affirmative, material misrepresentation supports a conviction of mail fraud without any additional proof of a fiduciary duty."); *United States v. Montgomery*, 384 F.3d 1050, 1062-63 (9th Cir. 2004)(affirming mail fraud conviction where evidence showed Montgomery omitted information from owners's statements); *United States v. Biesiadecki*, 933 F.2d 539, 542-43 (7th Cir. 1991) (district court did not abuse its discretion in admitting

evidence of omissions where there was also "abundant evidence" of affirmative misrepresentations).  *See also United States v. Green*, 592 F.3d 1057, 1063 (9th Cir. 2010)(concluding wire fraud does not require proof that the defendant's conduct violated a separate state or federal law or regulation).

As noted, the government presented evidence of affirmative misrepresentations as well as evidence from which the jury could conclude there were omissions of material fact.  The Court properly instructed the jury on both theories, and, therefore, Defendants are not entitled to a new trial on this basis.

**G.    Emails under Rule 803(6)**

Defendants argue the Court erroneously admitted emails into evidence as business records without a proper foundation. Defendants contend the government failed to establish that the emails were records of regularly conducted business activity as required under Federal Rule of Evidence 803(6).  Although Defendants did not identify any particular trial exhibits in their Motion for New Trial, Defendants belatedly identify several emails in their reply that they contend the Court admitted without a proper foundation (Trial Exhibits 16-18, 21-23, 25-26, 28, 32, 39, 47-48, 77, 144).  Defs.' Reply (#417) at 13.

With the exception of Trial Exhibit 144, the exhibits are emails authored by one of the Defendants and sent to another

Defendant in the course of their business operations.  Thus, those emails were properly admitted as admissions of a party-opponent under Rule 801(d)(2)(A).  Although Defendants do not make a specific argument as to Exhibit 144, the Court has reviewed the record as a whole and concludes the admission of Exhibit 144 similarly was not in error.

Finally, Defendants do not address how the allegedly erroneously-admitted exhibits affected the jury's verdict nor demonstrated how the admission of these email exhibits gives rise to substantial prejudice.  *See United States v. Rendon-Duarte*, 490 F.3d 1142, 1145 (9th Cir. 2007)(evidentiary error is harmless unless error materially affects the verdict).  *See also United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2000)(same).  Accordingly, the Court concludes Defendants have not established a new trial is warranted to avoid a manifest injustice.

### H.  Cumulative Error

The Court concludes there was not any miscarriage of justice during the trial even when the issues raised by Defendants are viewed cumulatively.  In fact, in twenty-one years as a trial judge the Court has not seen any proceeding in which Defendants individually and collectively were given more leeway to develop and to argue their theories of the case.

In summary, the Court concludes sufficient evidence exists in the record to support the jury's verdict in all of the respects that Defendants challenge, and none of the grounds alleged in Defendant's Motion (#402) demonstrate a new trial is warranted to correct a manifest injustice. Accordingly, the Court denies Motion (#402) for a New Trial.

### III. **Defendants' Motion (#404) for New Trial**

Defendants move for a new trial under Rule 33 on the grounds that (1) the Court erroneously excluded the testimony of Shawn Davis, Ph.D., an expert witness, and (2) the government referred to witness Danae Miller as a "victim" in closing argument.

#### A.    **The Court's Exclusion of Defendants' Expert Witness**

##### 1.    **Background**

In a February 28, 2013, pretrial case-management hearing the Court discussed the necessity of reciprocal discovery specifically to avoid the unexpected introduction of new evidence during trial that would threaten to delay proceedings and to prejudice a party or to interfere with the jury's proper consideration of the evidence. In its March 1, 2013, Order (#229), the Court set a deadline of April 26, 2013, for disclosure of expert witnesses. In its May 6, 2013, Order (#302) the Court also advised the parties of its intent "to resolve all

evidentiary issues not later than the Pretrial Conference"
scheduled for June 5, 2013.

On Saturday, May 25, 2013, more than a month after the
deadline to disclose experts, Defendants filed an expedited *ex
parte* request for CJA funding to engage Dr. Davis as an expert
witness. To permit Defendants to develop their record and
despite its concerns about the timeliness of the request, the
Court approved the request at that time.

The Court conducted the final Pretrial Conference on
June 5, 2013. Trial began with *voir dire* on June 8, 2013, and
continued into June 9, 2013. On June 9, 2013, the day before
opening statements and six weeks after the deadline for expert
witness disclosures, Defendants filed a Notice (#352) of their
intent to call Dr. Davis as an expert at trial. On June 12,
2013, the third day after jury selection and the fifth day of
trial, Defendants filed a preliminary Rule 16 disclosure
statement (#355) for Dr. Davis. On June 17, 2013, the government
filed its Motion (#360) in *Limine* to preclude Dr. Davis's
testimony. On June 19, 2013, Defendants filed a more detailed
Rule 16 Disclosure (#364). On June 19, 2013, in the midst of
trial, the Court conducted oral argument on the matter.

On June 24, 2013, the Court issued an Opinion and Order
(#371) granting the government's motion to preclude Dr. Davis's

testimony for the following reasons:  (1) the late Expert Witness Disclosure was a discovery violation, and Defendants' reasons for the untimely disclosure were "not credible"; (2) the late notice was prejudicial to the government; and (3) Defendants did not demonstrate Dr. Davis's testimony was reliable or otherwise helpful to the jury.  Having considered the issue anew in light of this post-trial motion, the Court adheres to its original ruling.

### 2.   Analysis

Defendants contend the Court erred when it excluded Dr. Davis's testimony because Defendants did not willfully commit a discovery violation and the underlying facts demonstrate their late disclosure was reasonable and, therefore, should be excused. Defendants' arguments largely reiterate those previously considered and rejected by the Court.  Defendants' arguments also ignore the detailed factual findings made by the Court in its Opinion and Order (#371).  For example, the Court explained Defendants were on notice from the date of the Indictment some two years earlier that the government was focusing on Defendants' representations that appeared on Summit's website.  Opin. and Order (#371) at 9-10.  In its opinion the Court identified several previous pretrial evidentiary hearings concerning those representations and specifically found Defendants' reasons for

their untimely expert witness disclosure were "simply not credible" or were "disingenuous at best." *Id.* at 10. The evidentiary record supports the Court's factual findings.

Defendants now contend because the trial was completed two weeks earlier than originally scheduled, the Court erred when it refused to break for a *Daubert* hearing to determine the admissibility of Dr. Davis's testimony. Defendants maintain any prejudice to the government by their late disclosure could have been remedied by breaking for a *Daubert* hearing. Defendants' argument ignores the realities of a multi-week jury trial where "breaking" to permit the government to locate an opposing expert and then convening a *Daubert* hearing while the jury potentially sat idle for a few days would severely interrupt the presentation of the government's case and substantially interfere with the jury's ability to stay engaged in the proceeding. Merely because the case concluded two weeks sooner than anticipated (which only occurred because Defendants realized they had offered all the noncumulative relevant evidence that they had) does not mean the interruption that Defendants sought in order to vindicate their last-minute offering of expert witness testimony would not be prejudicial to the government.

The Court also rejects Defendants' assertion that a *Daubert* hearing would have resulted in establishing the admissibility of Dr. Davis's testimony. Defendants insist Dr. Davis's opinion is specific to "website creators" rather than casual website surfers and that his opinion was premised on "decades of psychological research and peer reviewed scholarship." Defendants, however, have not shown Dr. Davis's particular opinion concerning cognitive processing of website information is generally accepted in the scientific community. Although Attorney Hoffman purports in her Affidavit to attest that cognitive psychology, Dr. Davis's field of expertise, explains why individuals may not retain information in text-heavy formats, Hoffman fails to establish that Dr. Davis's particular opinion has been subjected to peer review.

The Court is not convinced by *United States v. Rahm*, 993 F.2d 1405, 1414 (9th Cir. 1993), which Defendants rely on to support their position. In *Rahm* the Ninth Circuit concluded the proposed expert testimony, which suggested the defendant had difficulty with visual perception, was wrongfully excluded under Rule 702. The court determined the expert's testimony concerning the defendant's psychological test results that were critical to her defense strategy were beyond the understanding of the average juror. *Id.* at 1412. Moreover, the court found the expert's

"proffered testimony related to Rahm's specific perceptual difficulties, not to general human deficiencies that the jury could understand from their own experiences." *Id.* at 1414.

The facts here are quite different. Unlike the expert testimony in *Rahm*, Dr. Davis did not perform any tests on Defendants and his testimony would not have been specific to Defendants. Thus, unlike the expert testimony in *Rahm*, the main thrust of Dr. Davis's testimony (that people generally "gloss over" text-heavy websites) would have relied on general human deficiencies, a concept the jury could understand from their own experiences. Moreover, the point that Defendants sought to establish with Dr. Davis's testimony is within the common experience of lay jurors, and, therefore, expert testimony was not needed to advance it.

Finally, even if the Court erred when it excluded Dr. Davis's testimony, Defendants have not established the error affected the verdict. *See Hankey*, 203 F.3d at 1167 (evidentiary error is harmless unless it materially affects the verdict). Defendants contend Dr. Davis's testimony would have corroborated their assertions that they were unaware of the specific representations on the website or that they lacked intent with respect to those representations. The evidence presented at trial, however, overwhelmingly refuted that contention.

As noted, the government presented abundant evidence that Defendants were aware of the representations on their website and in their marketing materials; they were aware the representations were false; and, nevertheless, they continued to make those representations until December 2008. Thus, the Court concludes any error in excluding Dr. Davis's testimony was harmless, and, accordingly, Defendants have not established a new trial is necessary to correct a manifest injustice on this basis.

**B.    The Government's Reference to Danae Miller as a Victim**

**1.    Standard**

To prevail on a motion for new trial based on alleged prosecutorial misconduct, a defendant must show the government's conduct more probably than not materially affected the fairness of the defendant's trial. *United States v. Atcheson*, 94 F.3d 1237, 1244 (9th Cir. 1996). To prevail on a motion for new trial on the basis of a prosecutor's misstatements, a defendant must show the statements "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). Prosecutorial misconduct does not include reasonable inferences based on the record. *Id.*

## 2.  Analysis

Defendants argue the prosecutor improperly cited to facts not in evidence when the prosecutor referred to Danae Miller as a "victim" during the closing rebuttal argument. According to Defendants, Miller was not a victim because Defendants' fraudulent conduct ceased as of February 2008. Defendants argue the evidence at trial showed that Summit stopped making loans to Inland in February 2008 and that Miller and the four other exchange clients who testified (Michael Alessandro, Robert Lewis, Rolland Andrews, and Bert Manuel) all entered exchange agreements after that time.  Defendants also contend the exchange funds of Miller and others, therefore, remained with Summit as promised, and Miller's funds were not available to complete her exchange due to Summit's bankruptcy rather than any fraud as alleged by the government.  Defendants argue, therefore, the government's reference to Miller as victim during closing argument assumes facts that were not in evidence and constitutes a prejudicial appeal to the jury's sympathies.  The Court disagrees.

Contrary to Defendants' argument, the conduct that supported the government's conspiracy theory of wire fraud began in 1999 and continued until December 2008.  Indictment (#1) ¶ 13. As charged in the Indictment, the affirmative misrepresentations

were, among other things, that the customer's exchange funds would be deposited in a financial institution, would be maintained in depository accounts, and would remain available "*to complete the exchange process.*" *Id.* at ¶¶ 15, 17, 18, 19 (emphasis added). Moreover, the Court instructed the jury that the government alleged the conspiracy to commit wire fraud began in 1999 and continued through December 2008, and the alleged misrepresentations included, among other things, that the exchange funds would "remain available in bank accounts, money market accounts, or certificates of deposit to complete the exchange process." Jury Instructions (#383) at 20, 22. The government also alleged funds were not available to complete exchanges in December 2008 due to the outstanding Inland loan balance. Indictment (#1) ¶ 27. The evidence at trial established at the time that Summit filed for bankruptcy in December 2008, the outstanding Inland loan balance was $13.7 million and there were 91 clients who were still in the process of exchanging their property. Based on this evidence, the prosecutor argued exchanges could not be completed because the money was needed to pay Inland loan debt. Thus, under the government's conspiracy to commit wire fraud theory there was sufficient evidence from which the prosecutor could assert that Danae Miller and the other exchange clients who testified were

"victims." The prosecutor's closing statement, therefore, was based on the evidence and argued within permissible limits. *United States v. Moreland*, 622 F.3d 1147, 1161 (9th Cir. 2010)("[T]he prosecution must have reasonable latitude to fashion closing arguments.")

Even if the prosecutor's reference to Danae Miller as a victim could somehow be viewed as improper, Defendants have not established the statement affected the outcome of the trial. *See Moreland*, 622 F.3d at 1162. *See also United States v. Hermanek*, 289 F.3d 1076, 1102 (9th Cir. 2002). The Court properly instructed the jury that the lawyer's arguments are not evidence, and, as discussed above, the government presented overwhelming evidence of Defendants' guilt. *See United States v. Begay*, 673 F.3d 1038, 1046 (9th Cir.), *cert. denied,* 132 S. Ct. 754 (2011). The prosecutor's statement during the rebuttal closing, therefore, was not an impermissible appeal to the jury's sympathies, and, in any event, Miller's status as a victim was not crucial to the case. Thus, more probably than not, any alleged error in referring to Miller as a victim did not materially affect the fairness of the trial. Accordingly, the Court denies Defendants' Motion (#404) for a New Trial.

## IV.  **Defendant Larkin's Motion (#403) for New Trial**

Defendant Larkin moves for a new trial pursuant to Rule 33 on the grounds that (1) the Court erred when it denied Larkin's Motion (#303) to Reopen the Record to submit additional evidence in support of his Motion (#182) to Exclude his Proffer Statement and Related Documents and (2) the Court erred when it denied Larkin's Motion (#297) for *Kastigar* Hearing.  Larkin argues these errors violated his right to due process and a fair trial under the Fifth and Sixth Amendments.

### A.  **Background**

On February 1, 2013, Defendant Larkin filed a Motion (#182) to Exclude his Proffer Statement and Related Documents. Defendants Larkin and Neuman filed Notices of their intention to assert attorney-client privilege (#251, #253 respectively) in order to preclude or to limit the government's use of certain documents at trial.  The primary focus of the Motion was the particularly inculpatory document that the parties have referred to as the "Lyons Confidential Memo."  The Lyons Confidential Memo was authored by Defendant Lyons on October 17, 2006, and distributed to Larkin, Neuman, and others.  In that Memo Lyons made the following statements:

> As you all know, it has been the practice for quite some time to allow Summit Accommodators to advance exchange funds to Inland Capital,

> ostensibly as "loans."  Inland Capital has
> then proceeded to re-loan those funds to the
> principals of Summit, other businesses owned
> by those principals, and business associates
> of the principals and certain employees of
> Summit.  The majority of the loans have been
> used to fund real estate acquisitions by the
> respective borrowers.  As a group, the loans
> are typically neither well documented nor
> well secured, payment terms and interest more
> often than not do not reflect what the open
> market would charge for similar loans, and
> monitoring of security and enforcement of the
> obligations is substandard.
>
>                    . . .
>
> In substance, the use of exchange funds by
> Inland constitutes both a misrepresentation
> to our clients under their exchange
> agreements, as well as a breach of our
> fiduciary duty to our partners.  In essence,
> any kind of "run on the bank" where our
> exchangers needed their funds to close deals
> in rapid succession would result in Summit
> being unable to fulfill its obligations.

Trial Ex. 67.

On March 6, 2009, Defendant Larkin provided a copy of the

Lyons Confidential Memo and another document to the government

after receiving assurances that the documents would be considered

part of his proffer agreement.  On March 10, 2009, Larkin's

counsel, Janet Hoffman, also provided a copy of the Memo and

another document to Attorney Larry Matasar, who at that time was

counsel for co-conspirator Brian Stevens, a principal of Summit

and one of the targets of the government's investigation.  In

December 2009 Matasar withdrew from representing Stevens and provided copies of these documents and the rest of his file to Assistant Federal Public Defender Christopher J. Schatz, who was appointed as Stevens's new counsel.

On April 7, 2011, Stevens entered a guilty plea. On May 5, 2012, AFPD Schatz attached a copy of the Lyons Confidential Memo to Stevens's sentencing submissions filed with the court and contemporaneously provided a copy of the sentencing submissions (including the Memo) to Assistant United States Attorney Seth Uram. Although the Memo itself was not part of the public record for Stevens's sentencing, multiple references were made to the content of the Memo in the publicly-filed submissions. On March 4, 2013, AFPD Schatz provided AUSA Uram with a separate copy of the Lyons Confidential Memo as part of Stevens's ongoing cooperation agreement with the government.

In his briefing on this issue, Larkin asserted his proffer agreement limited how the government could use the proffer documents in this case, and Larkin argued an implied joint defense agreement (JDA) extended the attorney-client privilege to these documents. The government responded the Lyons Confidential Memo was not protected by a JDA, was not protected by an attorney-client privilege, and was not shielded from admission by

the terms of the proffer agreement because the government had obtained copies of the documents from independent sources.

After exhaustive briefing by the parties (including #199, #222, #223, #227, #230, #253, #268), the Court conducted a full-day evidentiary hearing on April 9, 2013. Additional briefing and evidence was submitted following the hearing (#269, ##271-276). On May 1, 2013, the Court issued a comprehensive 63-page Opinion and Order (#283) that included detailed Findings of Fact and Conclusions of Law. The Court held Defendants did not establish that the Lyons Confidential Memo was protected by a JDA or attorney-client privilege. The Court also found the Memo could be used by the government in an admissible form for an admissible purpose in its case-in-chief against all Defendants because the government had sources of the Memo that were independent of Defendant Larkin's proffer.

On May 3, 2013, Defendant Larkin filed a Motion (#297) for a *Kastigar* hearing in which he requested the Court conduct an additional evidentiary hearing to assess whether the government obtained its copies of the Lyons Confidential Memo from sources "wholly independent" of Larkin's proffer.

On May 8, 2013, Defendant Larkin filed a Motion (#303) to Reopen the Record in which he asked the Court to reconsider its

ruling regarding the proffer documents.  In his Motion to Reopen
the Record, Larkin sought to admit additional testimony from
Attorney Hoffman, which was purportedly withheld earlier on the
basis that it would have revealed confidential client
communications and defense strategy.  Larkin argued the
additional testimony would have established a JDA, and, thus
prevented use of the Memo at trial.

On May 16, 2013, the Court issued an Opinion and Order
(#313) granting in part the Motion for a *Kastigar* Hearing to
permit the Court's consideration of the *Kastigar* issues, but
denying the Motion in all other respects including Larkin's
request for a *Kastigar* evidentiary hearing.  The Court also
denied the Motion to Reopen.

**B.    Denial of Defendant Larkin's Motion (#303) to Reopen
        the Record and for Reconsideration**

Defendant Larkin challenges again the Court's interpretation
of his proffer agreement and the Court's factual findings and
reiterates many of the arguments he made previously.  Larkin
maintains the evidence he withheld from the April 9, 2013,
evidentiary hearing would establish that a JDA existed before
Larkin proffered to the government.  As the Court previously
ruled, Larkin did not provide any authority that permits the
Court, in the exercise of its discretion, to permit a party who

made conscious and strategic decisions to withhold evidence
specifically responsive to the Court's factual inquiries during
the evidentiary hearing to reopen the record to submit that
evidence after receiving an adverse ruling.  Opin. and Order
(#313) at 18.  Thus, Larkin has not demonstrated the Court's
previous denial of his Motion to Reopen was erroneous or an abuse
of discretion.

Defendant Larkin now argues evidence presented at trial
undermines the Court's previous factual finding that a JDA did
not exist at the time that Attorney Hoffman provided the Lyons
Confidential Memo to Attorney Matasar.  At trial Larkin and the
other Defendants testified the purpose of the Memo was to serve
as a "wake up call" to Brian Stevens and Defendant Neuman to more
aggressively reduce Inland loan debt.  Larkin also testified he
proffered to the government to provide the government with
information about Summit's business practices and history.
According to Larkin, his trial testimony contradicts the Court's
previous factual finding that he proffered to gain a tactical
advantage.  The Court disagrees.

Even if Defendant Larkin's trial testimony could only be
interpreted as he suggests, this testimony does not alter the
other myriad factual findings upon which the Court based its
pretrial conclusion that Defendants failed to establish that an

implied JDA existed at the time Attorney Hoffman provided the documents to Attorney Matasar.  Thus, Larkin has not demonstrated the Court's factual findings were erroneous or that a new trial is necessary to correct a manifest injustice.

Finally, Larkin insists AFPD Schatz unwittingly breached a privileged communication when Schatz "provided the Hoffman-Matasar communication with the attached Lyons Memo" to AUSA Uram. Larkin argues AFPD Schatz had an obligation to "stand silent" when asked by AUSA Uram after a March 4, 2013, hearing whether Schatz had a copy of the Memo independent of Larkin's proffer. Larkin maintains that without AFPD Schatz's March 4, 2013, communication, the government would not have "otherwise obtained" the Memo from an independent source.  Larkin's attempts to recast AFPD Schatz's provision of the Memo to the government as a breach of a confidential communication mischaracterizes the evidentiary record in several important respects.

First, it was already evident to the government that AFPD Schatz had a copy of the Memo because Schatz had attached a copy to Brian Stevens's sentencing submissions on May 5, 2012, which Schatz contemporaneously provided to AUSA Uram.  Opin. and Order (#283) at 25.

Second, the March 4, 2013, hearing was the second oral argument held in connection with Defendant Larkin's efforts to

prevent the government from using the Lyons Confidential Memo and other proffer documents (#228, #234).  At the March 4, 2013, hearing, the Court inquired whether the government had an independent source of the proffered documents, and AUSA Uram indicated that he might (*i.e.*, Brian Stevens).  During a break in the March 4 hearing, AUSA Uram asked AFPD Schatz, Stevens's counsel, whether his copy of the Memo was independent of Lyons's proffer.  In response to AUSA Uram's inquiry, AFPD Schatz stated he had received an email from Attorney Matasar to Nell Brown, Schatz's colleague, with a copy of the Lyons Confidential Memo and other documents attached.  AFPD Schatz then forwarded a copy of Matasar's email to AUSA Uram as part of Stevens's ongoing cooperation agreement.  At the conclusion of the March 4, 2013, hearing, the Court determined an evidentiary hearing that included testimony from Attorneys Hoffman, Matasar, and Schatz as to how the documents were shared would be necessary to resolve factual issues as to whether the proffer documents were protected by a JDA as Larkin asserted.

Third, while Attorney Matasar's email reveals that he obtained the Memo from Attorney Hoffman, the government and the Court nevertheless learned this same information at the April 9, 2013, evidentiary hearing.  It is completely illogical for Larkin to insist AFPD Schatz needed to "stand silent" about how Schatz

obtained the Memo while Larkin simultaneously was attempting to establish that the Memo was protected by a JDA, an inquiry necessarily requiring disclosure of that same information.

Finally, it is undisputed that the Memo itself is not protected by attorney-client privilege. Moreover, none of the communications between attorneys were admitted at trial.

Thus, the Court remains convinced there is not any basis to conclude that AFPD Schatz breached any duty necessitating a new trial.

**C. Denial of Larkin's Motion (#297) for *Kastigar* Hearing**

Defendant Larkin also argues his right to due process and a fair trial were violated by the Court's evidentiary ruling allowing the Lyons Confidential Memo to be used against him without conducting a *Kastigar* evidentiary hearing. Larkin argues factual issues exist as to whether the government's source of the Lyons Confidential Memo (*i.e.*, AFPD Schatz) was "wholly independent" of Larkin's proffer and that the Court erred when it refused to conduct an additional evidentiary hearing. In particular, Larkin contends the government was prohibited from asking AFPD Schatz for a copy of the Lyons Confidential Memo because the government's knowledge that the Memo existed was tainted by Larkin's proffer. The Court disagrees.

According to Larkin, the Court, in assessing the
admissibility and use of the Memo, properly reasoned that under
the terms of Larkin's proffer agreement the government could not
use the Memo itself to forensically search the Defendants'
computer hard-drives to locate exact copies of the proffer
documents for use at trial.  Larkin argues if the government was
prohibited from using the proffer documents to conduct forensic
searches to locate copies, it also was prohibited from using the
proffer documents to ask AFPD Schatz for copies.  While Larkin's
argument has some logical appeal, it ignores the facts.

Defendant Larkin mistakenly assumes AUSA Uram *only* obtained
the Lyons Confidential Memo through Larkin's proffer.  As noted,
the government contemporaneously received a non-proffer-
protected copy of the Memo in May 2012 when AFPD Schatz attached
the Memo to Brian Stevens's sentencing submissions.  Opin. and
Order (#283) at 25.  Recognizing that the government had an
independent source of the Lyons Confidential Memo a year earlier,
Larkin now attempts to connect the copy of the Memo attached to
Stevens's sentencing submissions to Larkin's proffer with "newly
discovered" evidence.  The Court is not persuaded.

First, the alleged evidence is not "newly discovered."  The
evidence that Defendant Larkin identifies are copies of documents
that Larkin submitted as part of his proffer, but were not shared
with Attorney Matasar.  This evidence is from Stevens's May 5,

2012, sentencing, which Defendants asked the Court to unseal two weeks before Defendants' trial. Larkin does not offer any explanation as to how evidence in his possession before trial is now "newly discovered." Larkin, therefore, has not established a new trial is warranted on the basis of "not-new evidence." *See United States v. Harrington*, 410 F.3d 598, 601 (9th Cir. 2005) (discussing the failure to discover evidence as a result of lack of diligence does not warrant a new trial under Rule 33).

Second, Defendant Larkin assumes because some documents attached to Stevens's sentencing submissions appear to be copies of Larkin proffer documents, the government must have provided Stevens with copies of all of Larkin's proffer documents in an effort to persuade Stevens to plead guilty. Larkin further speculates AFPD Schatz then attached the proffer copy of the Memo to Stevens's sentencing submission. Larkin's unproven assumptions, however, do not undermine the Court's earlier factual findings that Schatz's only source of the Lyons Confidential Memo was Attorney Matasar, which Schatz received in December 2009. Opin. and Order (#313) at 12-13.

After reviewing the record as a whole, the Court concludes Defendant Larkin has not demonstrated the government's inquiry of AFPD Schatz arose solely from Larkin's proffer. As the Court made clear in its factual findings on Larkin's original *Kastigar*

Motion, Attorney Hoffman's voluntary disclosure of the Lyons Confidential Memo to Attorney Matasar was not a proffer-protected event and Schatz's eventual possession of the Memo was not "tainted" by the proffer.  Opin. and Order (#313) at 12-13.  The Court's conclusion that the government had a source for the Memo "wholly independent" of Larkin's proffer, therefore, was not erroneous, and the Court's evidentiary ruling was proper.

Again, Larkin had a full opportunity to develop the record at the April 9, 2013, evidentiary hearing.  Despite explicit questions from the Court as to the circumstances surrounding the various disclosures of the Lyons Confidential Memo, Larkin and his counsel declined to respond to the Court's questions.  The Court stands by its decision not to conduct a new evidentiary hearing after Larkin declined the opportunity to develop that very record at the April 9, 2013 hearing.

In summary, the Court has considered the arguments presented in Defendant Larkin's Motion for New Trial and concludes they do not provide a basis to alter the Court's earlier rulings or warrant a new trial.  Accordingly, the Court denies Larkin's Motion (#403) for New Trial.

## CONCLUSION

For these reasons, the Court **DENIES** Defendants' Motion (#401) in Arrest of Judgment as to Count Two, and Motions (#402, #404) for New Trial. The Court also **DENIES** Defendant Larkin's Motion (#403) for New Trial.

IT IS SO ORDERED.

DATED this 28th day of OCTOBER, 2013.

/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District Judge