IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES,

          Plaintiff,

v.

MARK A. NEUMAN, TIMOTHY D.
LARKIN, and LANE D. LYONS,

          Defendants.

3:11-cr-00247-BR

OPINION AND ORDER
ON LOSS AMOUNT UNDER
USSG § 2B1.1(b)(1)

S. AMANDA MARSHALL
United States Attorney
District of Oregon
SETH D. URAM
DONNA M. MADDUX
Assistant United States Attorneys
1000 S.W. Third Ave., Suite 600
Portland, OR 97204-2902
(503) 727-1000

      Attorneys for Plaintiff

JANET LEE HOFFMAN
CARRIE MENIKOFF
Janet Hoffman & Associates LLC
1000 S.W. Broadway, Suite 1500
Portland, OR 97205
(503) 222-1125

      Attorneys for Defendant Larkin

**JOHN S. RANSOM**
Ransom Blackman, LLP
1001 S.W. Fifth Avenue, Suite 1400
Portland, OR 97204
(503) 228-0487

**MATTHEW A. SCHINDLER**
501 Fourth Street, #324
Lake Oswego, OR 97034
(503) 699-7333

       Attorneys for Defendant Lyons

**EMILY SIMON**
26 NE 11th Ave.
Portland, OR 97232
(503) 239-6101

**TODD H. GROVER**
Ward Grover, LLP
233 S.W. Wilson Avenue, Suite 204
Bend, OR 97701
(541) 312-5150

       Attorneys for Defendant Neuman

**BROWN, Judge.**

On July 3, 2013, following a 17-day jury trial, Defendants Mark A. Neuman, Timothy D. Larkin, and Lane D. Lyons were each found guilty of one count of Conspiracy to Commit Wire Fraud in violation of 18 U.S.C. § 1349 and one count of Conspiracy to Commit Money Laundering in violation of 18 U.S.C. § 1956(h). In advance of individual sentencing hearings set for December 16, 2013, the United States Probation Office (USPO) completed a Presentence Report (PSR) for each Defendant that includes a contested recommendation as to the correct loss calculation under

§ 2B1.1 of the United States Sentencing Guidelines (USSG or Guidelines).

In particular, the USPO recommends for each Defendant a 20-level enhancement to Base Offense Level 7 premised on a proposed factual finding that the 91 victims of Defendants' crimes sustained reasonably foreseeable financial losses of approximately $13.7 million. USSG § 2B1.1(b)(1)(K). The government supports the 20-level enhancement (#439, #452), but Defendants object to it as stated in their Memoranda (#440, #441, #444, #449, #451, #453) and at the November 25, 2013, hearing that the Court conducted to receive evidence and to hear argument on this specific Guideline application.

For the reasons that follow, the Court **ADOPTS** the PSR recommendation to apply a 20-level enhancement to Base Offense Level 7 for each Defendant pursuant to USSG § 2B1.1.

## DISCUSSION

### I. Standard of Proof

The Guidelines require the Court to calculate the amount of loss caused by the offenses of conviction (the conspiracies to commit fraud and money laundering) and "to correlate the severity of the sentence to the amount of the loss." *United States v. Treadwell*, 593 F.3d 990, 1000 (9th Cir. 2010). Section 2B1.1

governs loss amounts for the offenses of conspiracy to commit wire fraud and conspiracy to commit mail fraud.

In general the district court makes factual findings related to sentencing issues based on a preponderance of evidence standard. *Treadwell*, 593 F.3d at 1000. The government bears the burden of proof to demonstrate the amount of loss a victim has suffered. 18 U.S.C. § 3664(e). *See also United States v. Gossi*, 608 F.3d 574, 579 (9th Cir. 2010). When an extremely disproportionate impact on the sentence results from application of the loss enhancement, however, the government may have to satisfy a "clear and convincing" standard of proof. *Treadwell*, 593 F.3d at 1000 (quoting *United States v. Zolp*, 479 F.3d 715, 718 (9th Cir. 2007)). Six factors should be considered to determine whether a clear and convincing standard applies:

> (1) whether the enhanced sentence falls within the maximum sentence for the crime alleged; (2) whether the enhanced sentence negates the presumption of innocence for the crime alleged in the indictment; (3) whether the facts offered in support of the enhancement create new offenses requiring separate punishment; (4) whether the increase in sentence is based on the extent of a conspiracy; (5) whether the increase in the number of offense levels is four or less; and (6) whether the length of the enhanced sentence more than doubles the length of the sentence authorized by the initial sentencing guideline range where the defendant would otherwise have received a relatively short sentence.

*United States v. Riley*, 335 F.3d 919, 926 (9th Cir. 2003).
*Accord Treadwell*, 593 F.3d at 1000; *United States v. Jordan*, 256
F.3d 922, 928 (9th Cir. 2001). Due process is the primary
consideration when determining which standard to apply and may
require the clear and convincing standard for sentencing
enhancements based on uncharged or acquitted conduct. *Treadwell*,
593 F.3d at 1000.

Relying on *United States v. Booker*, Defendant Lyons argues
evidence at sentencing should be established beyond a reasonable
doubt. 543 U.S. 220, 232-234 (2005)(federal sentencing
guidelines are subject to jury-trial requirements). The Ninth
Circuit, however, has rejected this argument. *See, e.g., United
States v. Gonzalez*, 492 F.3d 1031, 1039 n.5 (9th Cir.
2007)(noting post-*Booker* the preponderance of evidence or clear
and convincing evidence standards remain applicable).

In turn, Defendant Larkin argues the clear and convincing
standard applies because a 20-level sentencing enhancement over a
base offense level of 7 has an "extremely disproportionate
impact" on his overall sentence. Although Larkin relies on
*United States v. Zolp*, 479 F.3d 715, 718 (9th Cir. 2005), and
*Gonzalez*, 492 F.3d at 1039, the Court concludes *Zolp* and *Gonzalez*
are distinguishable because they involved guilty pleas whereas
the loss enhancement here is based on conduct for which
Defendants have been tried and convicted and not on uncharged

5 - OPINION AND ORDER ON LOSS AMOUNT

conduct. *See United States v. Armstead*, 552 F.3d 769, 777 (9th Cir. 2008).

Indeed, Defendants' 17-day jury trial gave them "ample opportunity to challenge the government's evidence of the extent of the losses caused by the conspiracy," and, therefore, the due-process concerns that might otherwise trigger a heightened standard of proof are simply not present. *See Treadwell*, 593 F.3d at 1001-02. Moreover, the Ninth Circuit repeatedly has rejected applying a higher standard of proof when the size of the enhancement is based entirely on the extent of the conspiracy for which defendants were convicted. *See, e.g., United States v. Jenkins*, 633 F.3d 788, 809 & n.8 (9th Cir.), *cert. denied*, 132 S. Ct. 453 (2011)(preponderance of evidence standard appropriate to establish a 20-level loss enhancement because enhancement was based on the nature and extent of the conspiracy conviction); *United States v. Johnson*, Nos. 12-30129 and 12-30134, 2013 WL 4800224 (9th Cir. Sept. 10, 2013)(applying preponderance of evidence standard to 16-level enhancement for loss amount based on extent of fraudulent scheme); *Treadwell*, 593 F.3d at 1001-02 (applying preponderance of evidence standard to 22-level enhancement); *Armstead*, 552 F.3d at 777 (applying preponderance of evidence standard for multiple enhancements on conspiracy conviction based on amount of loss (two levels), number of victims (two levels), and role in the offense (four levels));

*United States v. Harrison-Philpot*, 978 F.2d 1520, 1523 (9th Cir. 1992)(holding enhancement based on conduct for which defendant was charged and convicted was on a "fundamentally different plane" than enhancements based on uncharged conduct).

Taking into account all of the relevant factors, the Court concludes a heightened standard of proof is not required in this case to determine the correct loss amount pursuant to USSG § 2B1.1.[1]

II. **Loss Calculations**

   A. **Standards**

For purposes of § 2B1.1, the determinative amount of financial loss in a fraud crime is the greater of the victims' actual loss or the amount of loss the defendants intended. USSG § 2B1.1 cmt. 3(A)(2013). The Guidelines define actual loss as "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* A reasonably foreseeable pecuniary harm is "pecuniary harm that the defendant knew or under the circumstances, reasonably should have known was a potential result of the offense." *Id.*

---

[1] Even if a heightened standard of proof applied for this Guideline enhancement, the Court notes the result would, nevertheless, be the same. Here the loss amount is the result of straightforward arithmetic calculations and is not based on issues of credibility that might be resolved differently depending on the standard of proof.

In addition, the defendant's conduct must have been the proximate cause of actual loss. *U.S. v. Hicks*, 217 F.3d 1038, 1048-49 (9th Cir. 2000). "The Court need not make its loss calculation with absolute precision: rather it need only make a reasonable estimate of the loss based on available information." *Zolp*, 479 F.3d at 718. Courts should "take a realistic, economic approach to determine what losses a defendant truly caused or intended to cause." *United States v. Allison*, 86 F.3d 940, 943 (9th Cir. 1996).

In a conspiracy the court may not automatically hold an individual defendant responsible for losses attributable to the entire conspiracy, but instead the court must identify the loss that falls within the scope of the defendant's agreement with his co-conspirators and that was reasonably foreseeable for that particular defendant. *Treadwell*, 593 F.3d at 1002.

**B. The Parties' Disputed § 2B1.1 Loss Calculations**

The USPO has calculated that Defendants' crimes caused the victims' losses of $13,706,557 based on the value of the 91 exchanges that Summit was unable to complete (approximately $28,000,000) less Summit's cash on hand (approximately $13,500,000) at the time that Summit filed for bankruptcy protection on December 19, 2008. As noted in the PSR, because this amount of loss falls between $7,000,000 and $20,000,000, the USPO recommends the Court apply the 20-level enhancement. *See*

USSG § 2B1.1(b)(1)(K). The USPO also has concluded the entire $13.7 million loss is attributable to each Defendant because that amount of loss was reasonably foreseeable to each Defendant under the circumstances of this case, and, therefore, each Defendant should receive the same 20-level enhancement. As the PSR writer emphasizes, even though Defendants Larkin and Lyons joined the conspiracy later than Defendant Neuman, the 91 exchanges at issue all occurred long after 2006 when Lyons clearly warned Larkin and the other conspirators about the illegal nature of their business practices and, in any event, these losses occurred within 180 days of Summit's bankruptcy declaration in late 2008.

The government supports the PSR recommendations and concurs that $13,706,557 is the correct loss amount for purposes of this Guideline issue. The government notes when Summit ceased business operations, its bank accounts showed Inland owed Summit $13.7 million in client funds. The government maintains this figure also represents the amount of client assets that Defendants had personally invested by the time the fraud scheme ended, and, therefore, this figure best captures Defendants' culpability.

Defendant Neuman objects to the PSR's loss-enhancement recommendation and argues he reasonably believed he and his partners possessed enough personal wealth to cover any losses, which he understood would be liquidated through the bankruptcy

9 - OPINION AND ORDER ON LOSS AMOUNT

process in order to cover such losses. In particular, Neuman argues in his Supplemental Memorandum (#449) that no loss was reasonably foreseeable to him because he possessed substantial personal assets that would be liquidated in the bankruptcy process and because there were insurance policies in place with $13 million in coverage. Alternatively, Neuman argues the reasonably foreseeable loss is $3.8 million, which is the shortfall after the bankruptcy trustee has liquidated assets and which would result in a loss enhancement of 18 levels.

Defendant Larkin contends prior to October 17, 2006, the date of the Lyons Confidential Memo, he had a good-faith belief in the legality of the business model, but he concedes he was on notice that the business practices were unlawful after that date. Larkin argues after October 17, 2006, he and Defendant Lyons established a plan to liquidate the Inland debt, and through his efforts (with Lyons) the Inland debt was reduced substantially. Larkin further argues he could not have anticipated the housing collapse, and, therefore, none of the government's asserted loss was foreseeable or attributable to him.

Finally, Defendant Lyons points out that he was the one who initially insisted on reduction of the Inland loan debt and through his efforts (and with Defendant Larkin's assistance) the Inland debt was reduced from $28,581,405 to $13,136,540 on the date that Summit filed for bankruptcy. Lyons also contends as of

February 2008, no new loans were made to Inland, and, therefore, none of the 91 victims' exchange monies were held by Inland. In his Second Memorandum Regarding Loss (#451), Lyons again reiterates his contention that the Inland debt was largely incurred before he was hired, and, thus, none of the victims' losses is actually attributable to him.

The Court finds Defendants' arguments to be after-the-fact, attempted rationalizations that do not address the standards applicable to determining a loss amount under § 2B1.1 whereas the PSR loss calculation of $13.7 million tracks both definitions of loss set forth above. As established at trial and noted in the PSRs, each Defendant knew at least as of October 2006 that their personal use of Exchangers' funds and the resulting Inland debt meant they never maintained enough liquidity to cover that debt if all exchanges were to be paid at the same time. That *was* Defendants' known "business model," and it persisted until the collapse of Summit in December 2008. Moreover, the trial evidence showed all three Defendants approved of language sent to branch owners in early 2007 that contained misleading information about the security of the exchange funds, and Defendants sent a newsletter to clients and prospective clients in April 2007 in which it was stated that their exchange money was held in trust. Trial evidence also included an email from Defendant Larkin to Defendants Neuman and Lyons dated October 10, 2007, in which

11 - OPINION AND ORDER ON LOSS AMOUNT

Larkin states: "[W]e are dealing with a dead real estate market and few opportunities to access equity." *See* #444-15 at 1. Thus, by late 2007 all Defendants reasonably knew or should have known that the assets they were holding were illiquid. Despite this knowledge, Defendants continued to solicit and to take in "new money" from Exchanger clients that they knew could only be held for a period of 180 days. By any of the argued standards of proof, it was reasonably foreseeable to each Defendant that Summit would not be able complete all of its pending exchanges when it filed for bankruptcy protection in December 2008. In addition, in light of the jury's guilty verdicts, the only reason Defendants could not complete Summit's existing exchange obligations in December 2008 is because Defendants continued to use a "business model" that they knew was illegal as of at least 2006. Accordingly, the Court finds the entire $13.7 million loss is attributable to each Defendant.

In summary, the Court **ADOPTS** the findings and recommendations in the PSRs concerning the amount of loss and the attribution of loss to each Defendant and, accordingly, overrules Defendants' objections to the contrary.

### III. Credits Against Loss

#### A. Standards

Under USSG § 2B1.1 cmt. 3(E), credits against loss should be made in certain instances:

> (i) The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim *before the offense was detected*. The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency.
>
> (ii) In a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing.

Emphasis added.

A fraud defendant is entitled to credit for refunds paid prior to the discovery of the offense. *United States v. Garro*, 517 F.3d 1163, 1167 (9th Cir. 2008). *See also Unites States v. Bright*, 353 F.3d 1114, 1118 (9th Cir. 2004). Repayments after detection of a crime, however, are not deducted from the loss because they show only an effort to reduce accountability. *Garro*, 517 F.3d at 1168. *See also Bright*, 353 F.3d at 1118.

**B.  Analysis**

For purposes of correctly calculating the initial Sentencing

Guideline range,[2] Defendant Neuman argues he is entitled to credit against the loss amount for the recoveries made by the bankruptcy trustee. According to Neuman, the trustee has recovered approximately 85 percent of the losses ($11,650,573), resulting in a loss of $2,055,984. Neuman also contends he executed a trust deed on September 18, 2008, in which he purported to give Inland all interest in several properties in an effort to provide $5 million to Summit. Although Neuman originally argued he should receive a credit against the loss under § 2B1.1 cmt. 3(E)(ii) because he pledged collateral, it now appears he has abandoned that contention in his second Memorandum on financial loss in which he uses a $3.8 million figure instead.

Defendant Larkin contends he is entitled to a credit for any recovery made by the bankruptcy trustee because the bankruptcy trustee secured the assets of Summit and Inland prior to detection of the fraud. Defendant Larkin also argues he is entitled to a credit against the loss for all of the personal assets that he and his co-defendants turned over to the bankruptcy trustee and that were liquidated by the time of sentencing. Larkin argues he should at a minimum be credited for the $5 million trust deeds executed by Defendant Neuman and

---

[2] Recoveries ultimately made and already paid to the victims of Defendants' fraud are obviously relevant to calculating Defendants' restitution obligations even if they are not available as offsets to the amount of loss under § 2B1.1.

14 - OPINION AND ORDER ON LOSS AMOUNT

co-conspirator Brian Stevens, an equal Summit partner with Defendants who pleaded guilty and was sentenced in a separate proceeding. See *United States v. Stevens*, No. 3:11-cr-00132-MO.

Defendant Lyons does not make a specific argument with respect to credits against loss, but he simply maintains that no loss is attributable to him.

The government submits Defendants should not receive credit for purposes of § 2B1.1 for the recoveries made by the bankruptcy trustee because the government asserts the crime was discovered on December 19, 2008, which is the date that Summit filed for bankruptcy protection. According to the government, Defendants cannot reduce the magnitude of their crimes for purposes of § 2B1.1 by the recoveries made by a third party. Moreover, the government maintains Defendants are not entitled to credits for the trust deeds as "assets pledged" under § 2B1.1 cmt. 3(E)(ii) because the trust deeds were not supported by promissory notes and did not provide a security interest for the benefit of the victims. See *United States v. Turk*, 626 F.3d 743, 750-51 (2d Cir. 2010)(in this mortgage-fraud case buildings were not pledged collateral because victims' mortgages were not properly recorded, and even if mortgages could be considered collateral, the victim's loss would be the unpaid principal).

Defendant Neuman concedes the fraud was discovered when Summit filed for bankruptcy on December 19, 2008. Neither Lyons nor Larkin dispute the date the fraud was detected.

Nevertheless, based on the evidence submitted at the November 25, 2013, hearing and during trial and for purposes of this Guideline issue, the Court finds Defendants' crimes were detected no later than December 30, 2008. As Agent Katherine Fearn testified at the hearing, the IRS Criminal Division opened a criminal investigation on December 23, 2013, after an article appeared in the *Bend Bulletin* newspaper reporting that Summit had ceased operating and that there was a cash shortfall. In addition, the testimony of Kevin Padrick, the bankruptcy trustee, established that he received a grand jury subpoena from the IRS and FBI for Summit's business records on December 30, 2008. Moreover, Danae Miller testified at trial that around December 19, 2008, she went to Summit's Bend office, discovered Summit had filed for bankruptcy, and then called the police.

Regardless of the precise date on which Defendants' crimes were discovered, for purposes of § 2B1.1 the Court concludes Defendants are not entitled to offset any recoveries made by the bankruptcy trustee after December 30, 2008, and all creditable recoveries have already been taken into account as noted below.

As established at the November 25, 2013, hearing, Terrell Vance, Summit's Chief Restructuring Officer appointed on

December 22, 2008, was responsible for securing at least $11 million in cash prior to the filing of bankruptcy. The Court presumes this $11 million is subsumed within the nearly $13.5 million cash on hand at the time Summit filed for bankruptcy.

The Court also determines Defendants are not entitled to a $10 million credit against the $13.7 million loss for the trust deeds executed by Defendants Neuman and co-conspirator Brian Stevens. As established by Mr. Padrick at the November 25, 2013, hearing, the trust deeds were not secured by notes and were not of any particular assistance in the bankruptcy process, and those assets have been or will be liquidated in the same manner as other recovered assets. The Court, therefore, concludes the trust deeds do not represent assets pledged as contemplated within USSG § 2B1.1 cmt. 3(E)(ii).

In summary, the Court finds Defendants are not entitled to any credits to offset the amount of loss the Court has found and, therefore, the 20-level loss enhancement remains applicable. Defendants' objections to the contrary are overruled.

## CONCLUSION

For these reasons, the Court **ADOPTS** the findings set forth in Paragraphs 23 and 40 (Defendant Neuman), Paragraphs 25 and 54 (Defendant Larkin), and Paragraphs 23 and 39 (Defendant Lyons) of the respective Presentence Investigative Reports and Sentencing

17 - OPINION AND ORDER ON LOSS AMOUNT

Recommendations pertaining to the loss amount of $13.7 million and that the entire loss amount was reasonably foreseeable to each Defendant.

IT IS SO ORDERED.

DATED this 10th day of December, 2013.

/s/ Anna J. Brown

---
ANNA J. BROWN
United States District Judge